I represent the government agencies that have been enjoined by the Orantes injunction for the previous 26 1⁄2 years. Three years ago, after a 15-year period where the injunction lay dormant and unenforced, the government moved to dissolve the Orantes injunction by making a considerable showing of significant changes of fact and law that warranted its dissolution. But ultimately, the district court declined to fully vacate the injunction. and erred in three critical respects. First, the district court held the government to an impossible burden, far in excess of the significant change in fact and law burden approved by this court and the United States Supreme Court. Second, the district court found areas of noncompliance with the injunction by the government, when in fact the government had been in substantial compliance with the injunction for over two decades. Finally, the district court lost track of the real focus of Judge Kenyon's injunction. Judge Kenyon's injunction was based on two principal components. One, that there were horrible country conditions in El Salvador that justified or that amounted to irreparable harm in the event Salvadorans returned to El Salvador. And secondly, Judge Kenyon's injunction was based upon a pattern and practice of discrimination, of abuse, coercion of Salvadorans by border patrol officials. Neither of those two principal components of the injunction exist anymore, and therefore, it's not equitable for this injunction to have prospective application. The changes that have happened since the 1980s are significant. If you recall, the plaintiffs in this matter brought this case saying that it was a policy of the Reagan administration to coerce and abuse Salvadorans and to prevent them from being able to get political asylum. And they pointed out the horrible conditions in El Salvador that was then in the midst of a bloody civil war where Salvadorans were being persecuted and massacred on a daily basis. Today, El Salvador is a multi-party democracy that cares for its citizens and has appropriate government structure to care for its citizens. During this entire time, plaintiffs have admitted that they've been monitoring Orante's injunction since the early decisions, yet they cannot produce a single Salvadoran class member who has been adversely affected by the government's noncompliance with the injunction during this entire time. Is that their burden to do? No. But it is absolutely significant evidence that the burden is on the United States to show significant changes in fact and law. And one of the things we did, Your Honor, is we said, look, there's been a 15-year period where there's been no enforcement actions, and the government has completely changed its attitude. Well, the government's issued, as Judge Patterson said, a number of policies that, on their face, would comply with the requirements of the injunction. But there's not really any evidence that those policies are actually complied with. Right. And by saying that, that was an impossible burden on the government. By the way, you mean to say Judge Morrow? I'm sorry. Judge Patterson. I'm confused. But in any case, Judge Morrow did say that the government did not come forward with additional evidence of compliance. But the judge, with all due respect, erred in saying that because we did, in fact, meet our principal burden of showing significant changes of fact and law. We did so by showing the 15-year period of non-enforcement actions, a complete change in attitude by the government, one that in the 1980s was considered to have a pattern and practice of abuse toward Salvadorans, but today, one that provides temporary protective status to Salvadorans to allow them another method of coming and staying in the country. It also completely changed things so that there wasn't this favoritism that Judge Kenyon imposed by treating Salvadorans differently. Instead, what the government did was it decided to take some of those actions on its own, some of the burdens that Judge Kenyon imposed on the government with respect to Salvadorans, and to translate that and to make it applicable to aliens of all nationalities. And they did so in the form of processing forms, and they did so in the form of the national detention standards. But you have to remember, Your Honor, with respect to this compliance issue, the judge granted plaintiffs an entire year to take discovery on the government's compliance. At page 395 of the supplemental record, Mr. Joaquin, my opposing counsel, says that he, the court, that he wanted to have discovery to see how the government has complied with the injunction, almost indicating that it was their burden to show that the government wasn't complying if the injunction was to stay in effect. I think they were just probably trying to find evidence to address your evidence of compliance, which you have to concede, even if you were in fully compliance, that wouldn't be sufficient, standing alone to meet your burden. Well, Your Honor, I agree that, for instance, in the Supreme Court case of Dowell, Chief Justice Rehnquist, he said that compliance is not the only factor, but it's unquestionably relevant. It's a safe factor. It's relevant. But that's why, I'm sure that's why there was discovery on the question. Right. But here's what I think is so significant about that, Your Honor, is in an entire year of discovery, or an entire year between the time that the government filed its motion and the plaintiffs opposed it, they couldn't come forward with a single Salvadoran class member to show that they were adversely affected by the government's noncompliance with the injunction. And that is absolutely significant towards this Court's consideration of whether the district court abused its discretion in declining to fully vacate the injunction. What burden does this injunction place on the government? Your Honor, with all due respect, the injunction continues to place a burden on the government because it requires the government to treat Salvadorans different than every other nationality for no reason whatsoever. And I say no reason whatsoever because the two principal components of the injunction are no longer in existence. There's no longer horrible country conditions in El Salvador justifying the injunction and the irreparable harm requirement. And there's no longer a pattern and practice of abuse and coercion of Salvadorans. And my opponent would have to admit that, that there's no longer a pattern and practice. I don't know that they would argue contrary to the point you made, but I suspect they would not. What I'm wondering as you make the point, though, is the injunction gives Salvadorans a special status, I suppose you would argue, but that special status isn't exalted over the status that should be given to any immigrant who comes into the country, is it? Well, it is, Your Honor, in a couple different respects. The main principal burden that then Arante's injunction does to the government is the issue of paragraph 11, the transfer position, the transfer provision. Now, first, as a preface, I want to say that showing a burden is not in any way in case law a factor in determining whether or not the government whether the injunction is exalted. I expect it's not there, but you can guess it. Maybe we'll look at that as we decide who wins. Sure. But in any event, there is a burden on the government. It requires the government to provide extra forms to Salvadorans that it doesn't have to provide to other aliens. So it's a set of forms, but really the essence of the injunction is to not to favor the Salvadorans, but to treat them the same as any other immigrant. Right, and, Your Honor, that's all the government wants to do is to give them the exact same forms that they do to all other nationalities, to treat them exactly the same way. But to have this burden imposed on us of having this injunction subjects the government to possible contempt proceedings in the event they find a Salvadoran who does, is adversely affected by noncompliance. And there's no reason why the government should have that burden on it. So the burden is the threat of an enforcement action? That's one burden. Another burden, one burden of the government is the fact that because there's an injunction out there, there's a possibility of being held in contempt for noncompliance. So the government constantly has to be concerned about... Shouldn't it be doing the same thing for every immigrant? I mean, immigration laws are not criminal laws, contrary to some of the argument we've heard here today. They're not meant as punitive laws. Shouldn't the government be advising everybody of their rights to immigrate? And to pursue political asylum. And, Your Honor, that's exactly what the government does, and that's one of the reasons why there's a significant change of fact in law here, a significant change of facts. One of Judge Mora's findings, I think, and, again, I haven't looked at this case in, I think, a week, but didn't she also find a lack of credibility in some of the statements that the government was complying with all of this? Well, the government did, excuse me, the district court did indicate that there were areas of noncompliance by the government, and that, Your Honor, is one of the two principal areas, or one of the three principal areas where the district court erred. And if you will, I could discuss that in further detail. Are you saying that that was a clear error as a matter of fact? Absolutely. It was an error of fact in determining that there was noncompliance. But it was also an error of law, and you could look at it de novo. And this goes to the respect of the initial injunction and whether or not that was supposed to cover Salvadorans both at ports of entry and Salvadorans between ports of entry. And it's very clear from Judge Kenyon's initial decision that it only covered Salvadorans between ports of entry. And what Judge Mora did was she criticized the government for her finding that the government failed to comply with the injunction at ports of entry, and that was a clear error. Judge Kenyon never specifically decided that it only applied at ports of entry, that it did not apply at ports of entry. But, Your Honor, with all due respect, all of the evidence before Judge Kenyon was testimony of Salvadorans who were apprehended between ports of entry by Border Patrol officials who were somehow coerced and abused into signing up for a voluntary departure, which is a term that is only used between ports of entry. So, in fact, Judge Kenyon's injunction and all the testimony that was before him and 175 trial witnesses during the 1988 trial, there were 175 trial witnesses and not one, there's no record of any one that testified about abuse by inspector officials at ports of entry, a completely different part of government processing. All of the testimony in 1988 and prior was of Border Patrol officials between ports of entry who apprehended Salvadorans. So it was clear error for the district court to consider that as a method of, as an area where the government failed to comply with the injunction. In fact, what is even more, I think, unreasonable about the district court's order on this point, with all due respect, is that the district court admits that initially, after 1988, the government was in literal compliance with this issue of port of entry enforcement and whether the injunction applied there. Mr. Lawrence. Yes. When I was in your position, I didn't like surprises. And so I'm going to try to keep you from having one by telling you that as I view the case at this point, at the time the injunction was granted, it was unquestionably necessary to have that injunction granted. Is that an accurate first point? Well, Your Honor, with all due respect. You weren't there. With all due respect, but I would still disagree. I would agree to this much, that there was a significant difference in the 1980s than there is today. All right. That's enough. I'm not suggesting that you have to go all the way because the injunction was granted, and we certainly aren't reviewing the grant of the injunction. It was granted. Correct. But time has passed. A lot of time has passed. That's right. And there have been times, even from what you've said to us, nobody has raised anything under the injunction. Hasn't there been a period of time when nothing has been raised? That's right, Your Honor. And we think that's the principal component of why there have been significant changes. In fact, So that's why I'm trying to keep you from getting to the surprise. Okay. All right. There's that period of time. First, it was necessary. There's been a period of time when there's been nothing. So what does it do? I want to know, I would say, at least a third of the Court, what burden does this injunction place on the government that the government shouldn't carry generally with all immigrants? And I would get an answer, nothing. And then I would say, so what difference does it make if the injunction is there or if it's not there? Well, the difference is that there has been significant change in facts that warrants its distribution. Sure, sure. The basis for the injunction, the war, the Civil War, and the special treatment is over. But there are other problems. So it's argued, at least as a factual matter, I think it was factual. You say it was a matter of law. Somebody reviewed and said, wait, there are still areas in which there are problems. So now we sit as a court of appeal and we say, factually, it doesn't matter. It's not so. Because of the need, the facts that caused the injunction to come into being have disappeared. But there are other problems that may not have even been anticipated that are still there. So the injunction is serving a purpose. But, Your Honor, that is error if that was the district court's reasoning. So if it's not, all right, I'm following you. I might be a step ahead of your point. Because I'm accepting that, all right? If that's not so. But what difference does it make if the injunction stays on the books? It makes a difference because, Your Honor, the transfer provision still has an effect on the government's processing of aliens. For instance, one of the amici briefs raised an issue of workplace enforcement actions. It talked about how all other aliens were transferred out of the area after an enforcement action by Immigration and Customs Enforcement. After an enforcement action by Immigration and Customs Enforcement. But Salvadorans couldn't be transferred. And that significantly affects ICE's operational components by having to treat Salvadorans differently than other aliens. Could the transfer provision be separated from the rest of the injunction and amended or deleted? Sure. You know, one of the things that the district court did was it found that there were at least two paragraphs of the injunction that deserved to be dissolved, but then decided to keep everything else. So she could have, the district court could have deleted paragraph 11 as well, but chose not to. Did you argue for that? We argued that the entire injunction should be dissolved, yes, Your Honor. We did. Did you argue specifically for paragraph 11? Well, what we did was we, I mean, the answer is yes with qualification. We argued that the entire injunction should be dissolved. We did modify paragraph 11 at an earlier point. At that point, it looked like the burden was okay for the government, that it wasn't going to be excessive. Things have changed for the government. Things have changed, yes, Your Honor. I do want to reserve three minutes for rebuttal, but I appreciate your time. Thank you. Are you going to tell us why we still need the injunction? Yes, I am, Your Honor. The injunction provides basic protections. It's not a matter of creating extraordinary rights for Salvadorans. The fact that Salvadorans, the fact that a nationality benefits from it is due to the nature of the plaintiff class. As this Court stated in ruling on the first injunction, it's not that it's, in a sense, elevating one nationality over all others. Excuse me. Would the court services officer back there please quiet down the hall? Thank you. Okay. Go ahead. Yes. The injunction's protections are not extraordinary rights. The injunction prohibits immigration officers from coercing or otherwise discouraging class members from seeking asylum. It requires that they, that officers provide class members with an advisal of their rights, oral and written, with respect to asylum and hearings. It establishes basic requirements in detention. It's burdensome. It's burdensome. You wouldn't argue that it's not burdensome. Well, the government in their motion argued burden with respect to expedited removal. That was the principal argument they submitted in seeking to dissolve the injunction. The court addressed expedited removal separately, and whether there's a facial conflict between expedited removal and the injunction, modified the transfer provision and the advisal to eliminate any claim of a conflict between expedited removal and the injunction. And the government thereupon abandoned any claim that there was a burden caused by or that expedited removal was an issue in the case because of the no longer asserting a burden with respect to transfer or the advisal. The government has not appealed that aspect of the decision at all. And the government has not asserted burden as an issue. The government actually claims that its current policies with respect to detention and with respect to removal processing copy provisions of the injunction and go beyond that. However, the fact of the matter, and the reason they want to – they want the injunction dissolved and burden can be – maybe they didn't talk about burden, but burden is a factor. And what the government did not do – At least burden can be a factor in the opinion of a third of this Court. That's what I should say. Well, Your Honor, I would submit that Judge Murrow applied exactly the correct standard in assessing whether the injunction should be dissolved, which is she looked and examined the changes that the government asserted and found that the government failed to establish changed circumstances that warrant dissolution. Because the injunction was based not on official policies. It was based on practices. It violated official policies. The court correctly found that the proper inquiry was whether the government has changed its actual practices. So it's not a matter of having new detention standards. It's a matter of, in fact, what are the practices in detention. It's not a matter of having new forms in removal. It's a matter of how those forms are administered and how people are treated in the reality of processing. I would like to briefly address each of the three changes the government asserted in this case for saying the injunction should be dissolved. Changes in El Salvador at the end of the Civil War, changes in detention with the promulgation of detention standards, and changes in removal processing with the creation of new forms and with expedited removal. With respect to conditions in El Salvador, the court found that there have been significant changes in El Salvador. But the court also found that these changes did not warrant dissolving the injunction because the injunction continues to be justified on completely independent grounds, practices in the United States. That is what this Court, in fact, found in reviewing the original injunction in this case. This Court found no need to reach the government's argument that country conditions were irrelevant because the injunction was fully warranted as a remedy for practices in the United States on the part of the Immigration Service. The Court did find, the Court, Judge Morrow did find quite correctly that there remain Salvadorans with valid asylum claims, that there are conditions that present that, that present valid asylum claims, and that the injunction, therefore, continues to benefit those individuals who are class members seeking asylum in this country. But the injunction, the Court found, continues to be justified because the government failed to establish changes in its actual practices in the United States. With respect to detention conditions, again, the Court properly focused on actual practices. The Court examined an extensive record that includes reports from the American Bar Association, from the United Nations High Commission on Refugees, and the monitoring forms of DHS itself. And the Court found violations. The government argues that the violations are minor technical issues. And this is nonsense. INS monitors did not count minor infractions. And the evidence across the board is that there's underreporting of violations. The DHS Office of Inspector General inspected facilities and found instances of noncompliance that were not identified by IS monitors. Similarly, the Government Accountability Office conducted a study of detention and found clear in July 2007, and the Court may take additional notice of the report that was submitted by AMICI, National Injury Justice Center. And the report found, again, significant underreporting of violations. GAO found that while 16 out of 17 facilities they inspected that used the pro bono legal services telephone system had significant problems in the telephone access. That was reported, any problems were reported only in five IS monitoring of facilities, and only three of those facilities were found deficient with that respect. Now, are these facilities, to the extent they're deficient for El Salvadorans, also deficient for everybody else coming to this country seeking political asylum? Yes, they are. They absolutely are. There's no evidence of treating Salvadorans in detention differently than other nationalities. They're deficient for everyone, but the fact that they're deficient for other nationalities is not a reason for depriving class members in this case of the protection of the injunction. You see, you can make that argument, and we certainly will listen to it with some sympathy, but if the effect of the injunction is to give the Salvadorans refugees preferences that other refugees deserve but do not have, wouldn't that be a reason to dissolve it? No, Your Honor. The, if anything, it argues that other nationalities should have that protection, where what you have are violations of basic access to counsel, basic access to legal information, basic access to, or the ability to present asylum claims, where you have those violations happening. The fact that other nationalities are also suffering those problems probably warrants also relief, but it's not a reason for dissolving the injunction that protects the class members in this case. Well, the reason it can be argued that it is in this case is because there were factors that caused, that brought about the injunction, the granting of the injunction, and those factors are gone. Those factors... The Civil War is over. Right. And that was the basis for one prong, one of the independent grounds on which the injunction issued, which was basically what the court, what Judge Morrow referred to as the due process basis, which was basically applying the Matthews v. Eldridge balancing test and looking at the harm of people fleeing the Civil War and the need for an advisal of their asylum rights. However, as this Court stated in reviewing the injunction, that was only one prong, and the injunction was also justified on completely independent grounds of a pattern and practice of violating official policies and violating the rights of class members here in the United States. Well, the real issue is over the advisals, isn't it? That's the heart of the injunction and the heart of the remedy, the giving of advisals. The giving of advisals plus access to counsel and access to legal rights information in detention. That's part of it, and I take it that the fact is that the advisals are not given at ports of entry, particularly Senate cedar. And that's the reason, the primary reason the judge thought the injunction was needed, or needed to continue in effect. Isn't that right? Well, the Court found that it was the burden of the government to show that it had changed its practices in at ports of entry and also in the United States in terms of removal processing and in terms of detention. Not only, not solely with respect to the advisal, but with respect to conditions of detention and with respect to in detaining people and holding them at border patrol stations, giving them access to telephones and allowing them to keep written materials such as phone numbers to relatives. But the principal area of deviation from what the injunction required is in Senate cedar, right? Well, I think Your Honor is referring to the government's claim that the United States interreligious, push on interreligious freedoms findings about failure to give advisals that, actually not the right to give advisals, but the advisals required by the expedited removal procedures occurred, but not only at San Ysidro. The USURF study, which is the one comprehensive study that we have that's independent of expedited removal, actually found across the board, across six studies, six sites for expedited removal that they studied, that the required advisals of rights were not consistently given. When the government claims that that only applies to San Ysidro, or that San Ysidro was the only site where that was statistically meaningful, that's simply wrong. What USURF found was that across the board there was a failure to give the notice. What was only statistically meaningful at San Ysidro was the finding that there was a correlation between the failure to advise arriving people in expedited removal and the failure to give that U.S. law provides protection if you fear persecution. The failure to give that paragraph of advisal has a correlation with ultimately people asserting credible fear claims. Well, the government also argues that, but with respect to the separate issue, which is whether current procedures eliminate the need for the injunction, the government argued that the expedited removal procedure provided full rights and advisals to people who go through that process. The government is also clearly wrong in asserting that the injunction does not apply at ports of entry. The class definition is quite clear. The government attempts to obscure that in the reply brief by asserting that, well, Judge O'Connor, and actually the final 1991 stipulated injunction, with a few modifications of the permanent injunction, does not incorporate the class definition explicitly. So the government argues that some unclarity as to what is the class definition. And you needn't be afraid as you continue. You're being taped. So if anybody who misses any words you said who wants to hear it can hear it. So go ahead. But what the government doesn't mention is that in issuing the permanent injunction in 1988, the Court specifically modified the class definition and expressly did so. And there was no need in 1991 to revisit the definition of the class. The class definition is quite clear. And it specifically encompasses people at ports of entry in two ways. Class consists of Salvadorans eligible to apply for asylum under Section 8 U.S.C. 1558, right? Basically the ---- has given us the number. Go ahead. And that definition basically provides for people eligible to apply for asylum within the United States or ports of entry. And the injunction also includes a reference to 8 U.S.C. Section 1357. The first site was 8 U.S.C. 1158. The second site, 8 U.S.C. 1357. The injunction applies to people in the detention of immigration officers. I'll tell you the weakness of your argument to one-third of the Court. There's no doubt in my view that there's a reason to be concerned about how refugees are treated. All refugees are treated, and we've seen examples of why. The question is, though, whether we need to continue an injunction that was put into effect to correct certain wrongs, and those wrongs no longer exist. So you say, all right, and the Court said, all right, they no longer exist, but there are others. Well, if those others affect all refugees, then this injunction may be giving Salvadorians a special status among refugees. And that might be the defect, the problem. Now, I'm not saying that it is, but I think you need to tell us why that isn't something to be concerned with. Certainly. Your Honor, part of the problem is, and again, the evidence we found in looking at practices and looking at the discovery of detention standards, in fact, Salvadorians also are suffering these abuses. The injunction is not being respected with respect to telephone access, with respect to access to legal rights materials, with respect to processing. And that we submit for these problems. The problems differ from the problems that all refugees who come into this country are suffering at this point. Well, those are very much the same problems that Judge Kenyon addressed in issuing the injunction in the first place. They have not been corrected, and what we found is evidence both in removal processing, evidence in detention of violations. Now, the fact is, other nationalities are also suffering those violations. But again, as this Court said in upholding the injunction, the identity, the fact that the remedy is nationality-specific is simply a matter of the membership, the composition of the plaintiff class. It's not elevating one nationality over others, and it's not a reason that other individuals are having their rights violated. It's not a reason to take away the protection that is there of this injunction. I guess one other, I mean, I've been thinking about this issue as well, because we do see many, many, many immigration cases, and there are routine problems. I guess the way I looked at it is we don't have those cases in front of us. This is the case we have in front of us. There are many, many reasons, and this is a question, I guess, bottom line for you. There are many reasons, other than the Civil War, why for this class the injunction should issue. And those reasons don't appear to have changed despite the Civil War. But given that we don't have an action involving everybody else in front of us, should we be annulling what we know? Or should we be looking at the other people who are not covered by the injunction at all? Your Honor, we agree that's a huge problem. The fact is this lawsuit is not a vehicle for addressing the situation of other individuals who are not within the plaintiff class. But the evidence we've looked at certainly shows problems that are across the board. With respect to extension conditions, I just want to touch on some of the issues not totally brought out, I think, so far. There are basically the district court found certain violations that she expressly mentioned in the decision. But there are many other such violations in the record. The NIJC amicus brief identifies many of them. For example, with respect to legal rights materials at pages 24 to 25. But the record also contains other examples. For example, excerpts of Record 1290 to 92, the Changa Pahoa Parish Jail in Louisiana. Two consecutive UNHCR inspections, three years apart, found that the only immigration legal materials available were either outdated or useless. The Seattle CSC detention facility, the American Bar Association found, and this is at ER 1416 to 17, found the immigration materials completely deficient, only in English with no foreign dictionaries available, and the library only able to accommodate two people at a time for a population of 160. Let me ask you about paragraph 11 before you run out of time. Certainly. Is there an objection to dissolving paragraph 11, the transfer provision? Yes, Your Honor. The transfer provision provides an important protection to allow class members It's a limited limitation. It's only a limitation for seven days for those who are not represented by counsel to allow them to obtain assistance of counsel. That appears to be burdensome for the government. Well, and it's a provision that the district court modified basically with respect to the in proceedings that are not on appeal. The government did not take up the whole issue of any conflict with expedited removal and transfer, and the government never asserted evidence of burden apart from that in those proceedings that were not appealed. But I would point out burden is not really in the standard to look at. And I think the judge quite properly set forth a standard that applies. All right. Does anyone have questions, further questions? All right. Thank you, counsel. Thank you. Your co-counsel is going to have to be very careful when she plays poker. Your Honor, Your Honors, I wanted to address, I didn't have a chance to address detention standards as Mr. Joaquin said in his presentation today. It's something that I think is crucial to this Court's decision with respect to detention standards. And this is a quote, and we can play back the audio tape later to prove it. He said, There is no evidence of treating Salvadorans different in detention. That is a fact. There is no evidence of treating Salvadorans different in detention. In other words, there's no evidence that was produced that showed that Salvadorans were treated, are treated differently since the time of the injunction. That shows that the government has been in compliance with detention standards. Not necessarily. It might show it's not been in compliance with not only the injunction but the law in general. I'm sorry, Your Honor. I'm just saying it's not necessarily, the logical conclusion isn't necessarily that the government, from that statement isn't necessarily that the government's been. Right. Okay. I follow Your Honor's line of thought. But nevertheless, for plaintiff to admit that there's no evidence of treating Salvadorans different, it shows that the injunction has worked. It's done its time. And there's no reason now for it to have prospective application. The government has made changes that allow this Court to say, hey, there are protections in place now. Mr. Joaquin referred to a USURF study, United States Commission on International Religious Freedom. The record is different than Mr. Joaquin says on that issue. If you look at supplemental record, page 416, the overall finding of that commission was that the study found, quote, the study found mandatory procedures in place to ensure that asylum seekers are protected under expedited removal. That's what the USURF study shows. There was a study, Judge Schwarzer raised an issue with respect to the San Ysidro Port of Entry. But, Your Honor, at San Ysidro, this was just one little part of the study that was an attachment to the main finding of the USURF study. The main finding was that the government had adequate protections in place. And that's what the Court should emphasize or consider strongly when considering whether or not the government has made significant changes or shown its burden of significant changes of fact. And also look at page 31 of the district court's opinion, footnote 41. She indicates in that particular place that compliance alone and the fact that there have been no enforcement actions in, she said, 18 years, is significant and that it suffices to meet the government's initial burden in the context of the injunction under consideration here. But for whatever reason, even though the district court admitted that that 18-year period of no enforcement actions was enough to meet its initial burden, the district court required more. And one of the things the district court required with respect to the forms was that, she said that we didn't show that those particular forms were actually given to aliens. But, Your Honor, there's a presumption of regularity that applies here. And it was an error of the district court to determine not to apply the presumption of regularity in this instance, particularly when the government had already made a significant showing of facts, changes of facts in law. But to get back to Judge Farris's point, you're absolutely correct, Your Honor. The two principal components of the injunction that Judge Kennedy put in place are gone. There's no longer a civil war and there's no longer a pattern and practice of discrimination and abuse, and nor did plaintiff's counsel suggest that there was in his time before the court. The two principal factors of the injunction are gone, and that's why there have been significant changes of fact that justify and warrant and really, I hope, obligate this court to determine to fully vacate this injunction and to reverse the district court. If there are any further questions, I'll be glad to respond to them. I just have one. It seemed like the government's main argument was that the civil war ended in 1992, and you brought this motion in, what, 2005? That is correct. We brought the motion in November of 2005, and we showed that there were significant changes based on the no longer being a civil war. But we also showed all the prophylactic measures the government has taken since that time to ensure that all aliens are protected equally in their rights to pursue political asylum. We showed that through the imposition of temporary protective status, which allows Salvadorans another method of being able to stay in the country and shows that there's no longer a policy in practice, if there was one, of discrimination or abuse against Salvadorans. We showed that TPS was available. We showed that there were these additional forms that were created for all aliens, not just Salvadorans, to make it clear that all aliens have the possibility of pursuing political asylum. We showed that through the forms, and then we showed in the area of detention standards, the other part of the injunction, that we took all the measures that Judge Kenyon put in place, and we expanded them, not just a paragraph of saying that there needs to be a law library at detention facilities, but we expanded that into a 21-page detention standard on the issue of legal access to materials. And plaintiff is incorrect, and the court was wrong, and it was an abuse of discretion, to consider little violations of the detention standards to equate to being a violation of the Orante's injunction itself. The detention standards don't indicate whether or not a particular alien of a particular nationality was somehow harmed by the violation. But here, compare that to 1988, when Judge Kenyon had before him 175 trial witnesses who were all saying that Salvadorans were being abused and coerced by Border Patrol officials when they crossed the border, and they were being forced into signing voluntary departure forms and not allowed to get their rights of political asylum. You know what's weakened your presentation as I've heard it? You said earlier, just a second or so ago, if there ever was one. And now you're defining it. Well, of course there was one. Your Honor, I'm... You said the need for the injunction no longer exists if there ever was one, as if maybe there's some questions. Oh, sure, Your Honor. I was representing the government. That's what you're saying is the government. But I understand fully that Judge Kenyon found a pattern in practice. And that is a critical point. And I agree with you, Your Honor, that he did find there was a pattern in practice of discrimination in the Peace Corps at Salvadorans. It's laced throughout his opinion. And here, there is no... It's all right. Okay. You just said if there ever was one, as if there's some question about it. Well, there's no question that Judge Kenyon found... That weakened your presentation. Well, I don't want Your Honor to feel that way because I concede that Judge Kenyon absolutely found there to be a pattern in practice. And that is not in existence anymore. And together with that not being in existence anymore and together with that and El Salvador now being a multi-party democracy that respects the human rights of its citizens, a complete change from 1992 and beforehand when there was a civil war going on and when Salvadorans were being persecuted and massacred on a daily basis. Those two components of the injunction are gone. Those are significant changes of fact that warrant dissolution of the injunction. And I urge this Court to reverse the district court's opinion, which was in abuse of discretion, and not in declining to fully vacate this injunction. And I thank you for your time. Thank you very much, counsel. Thank the counsel for that excellent argument. And this Arantes-Hernandez v. Chertoff will be submitted and this Court will be adjourned for this session of the day. Thank you. Thank you.
judges: Farris, Wardlaw, Schwarzer